UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

————————————————————

UNITED STATES OF AMERICA,　　　）
　　　　　　　　　　　　　　　）
v.　　　　　　　　　　　　　　 ）
　　　　　　　　　　　　　　　）　　Criminal No. 17-10129-LTS
WALTER JOHNSON,　　　　　　　 ）
　　　　　　　　　　　　　　　）
　　　　　Defendant.　　　　　　）
————————————————————

ORDER ON MOTIONS TO SUPPRESS (DOCS. NO. 87, 92)

February 25, 2019

SOROKIN, J.

　　　　Defendant Walter Johnson is charged with (1) distribution of child pornography and (2) possession of child pornography. Johnson moved to suppress various physical evidence obtained through searches in early 2017, Doc. No. 92, and evidence of statements he made on April 27, 2017, during questioning at his home and at the Framingham Police Department, Doc. No. 87. The government opposed. Doc. No. 100. The Court held a hearing on January 15, 2019, that was evidentiary only as to the motion to suppress the evidence of Johnson's statements obtained during the search of his home. See Docs. No. 101, 103, 108, 109, 116. For the reasons that follow, the motion to suppress physical evidence, Doc. No. 92, is DENIED, while the motion to suppress the evidence of Johnson's statements, Doc. No. 87, is ALLOWED IN PART and DENIED IN PART.

I.    FACTS

    A.    Initial Investigation

The Court makes the following factual findings based on materials submitted by the parties and, as to the circumstances of Johnson's April 27, 2017, statements, the credible testimony offered during the January 15, 2019, evidentiary hearing.[1]

On January 19, 2017, a Rhode Island State Police detective began investigating a Craigslist user who had made a posting on the site entitled "Perv on your daughter." Doc. No. 100 at 1. On January 24, 2017, the detective communicated via email with Richard Woodhead, the Craigslist user who made the post. Doc. No. 93 at 1. On January 27, 2017, the detective, working with Department of Homeland Security Special Agent James Richardson, served a warrant authorized by a Rhode Island state court magistrate on Yahoo, Woodhead's email provider, that directed the seizure of "[a]ny and all records associated with" Woodhead's email account. Doc. No. 93-1 at 4. Among the emails Yahoo provided in response to the warrant were some to Woodhead from various Craigslist users. Doc. No. 93 at 2.

On February 24, 2017, the United States Attorney's Office for the District of Rhode Island served a federal grand jury subpoena on Craigslist that directed the company to produce subscriber information for three of the Craigslist users whose emails had appeared in Woodhead's Yahoo account. Doc. No. 93-2 at 25–26. The subscriber information sought "includ[ed] names, addresses, telephone numbers, contact email addresses and any other subscriber information related to" the users, "as well as any advertisements placed or responded to by these email addresses." Id. at 26. When Craigslist returned the requested material on March

---

[1] The following witnesses testified at the hearing: Special Agent Janet Connolly; Special Agent James Richardson; Patricia Kryzak, the defendant's life partner; and Walter Johnson, the defendant. See generally Doc. No. 116.

7, 2017, the data returned included not only the non-content subscriber information sought but also content such as private communications, including images. Doc. No. 93 at 3. The material from Craigslist identified another Yahoo email address that was associated with one of the Craigslist users. Doc. No. 100 at 2. That Craigslist user, and the owner of that Yahoo email address, would ultimately turn out to be Johnson. Id. at 2–3. During Richardson's review of that material with an assistant United States attorney, the attorney asked Richardson to stop reviewing the records because a search warrant would have been required to seek message content, while a subpoena could only have lawfully sought non-content user information. Id. at 2 n.2; Doc. No. 93 at 15.

On March 13, 2017, Richardson sought and obtained a warrant, issued by a magistrate judge in the District of Rhode Island and served on Craigslist, for much of the non-content and content information that Craigslist had returned in its response to the earlier subpoena. Doc. No. 93 at 3. Richardson's affidavit described his work in his position on the Internet Crimes against Children ("ICAC") Task Force in Rhode Island. It stated that Richardson's investigation of Woodhead had grown out of the Rhode Island State Police detective's investigation of Woodhead's Craigslist post. Doc. No. 93-2 at 12–13. It explained that Woodhead lived in South Attleboro, Massachusetts, Doc. No. 93-2 at 18, while another target—who would turn out to be Johnson—lived in Framingham, Massachusetts, id. at 23. It also stated that Craigslist had already provided records showing that Woodhead's Craigslist posting had been made from Cumberland, Rhode Island, id. at 13, and that Woodhead had told Johnson that he was in the "Providence area," id. at 23. It described Richardson's use of the Rhode Island State Police's undercover telephone line, which has a Rhode Island area code, to communicate with Woodhead. Finally, the affidavit also candidly revealed that Craigslist had already provided some of the material

sought by the warrant and stated that Richardson explicitly did not rely on that material to establish probable cause for the issuance of the warrant. Id. at 25–26.

On March 29, 2017, the government received materials from Craigslist in response to the warrant. Doc. No. 93 at 4. That material again identified Johnson's Yahoo email account. Doc. No. 93-3 at 21. On that basis, on March 31, 2017, Richardson sought and obtained a search warrant from the same District of Rhode Island magistrate judge for records associated with Johnson's Yahoo email account. Doc. No. 100 at 2–3. The warrant stated that the records sought were located in the Northern District of California. Doc. No. 93-3 at 2. Yahoo's response, provided on April 5, 2017, included over 9,900 of Johnson's emails. Doc. No. 93 at 5. The information received from Yahoo allowed the government to determine that the account was associated with 20 Burdette Avenue, Framingham. Id.; Doc. No. 93-4 at 11. The government also determined that Johnson owned the home located at that address. Doc. No. 100 at 3.

On April 6, 2017, the United States Attorney's Office in Boston obtained a search warrant from a magistrate judge in the District of Massachusetts for that address based on an affidavit by Special Agent Janet Connolly. See Doc. No. 93-4. The affidavit relied in significant part on the emails obtained from the March 31 warrant. Id. at 11–13. The warrant itself authorized a search for "[a]ll records, in whatever form, and tangible objects that constitute evidence, fruits, and instrumentalities of 18 U.S.C. § 2252A." Id. at 5.

B.     Physical Search and Interrogation

Johnson lives at 20 Burdette Avenue in Framingham, Massachusetts. Doc. No. 116 at 189. His home is a small, one-story single-family house with a detached garage at the end of his driveway abutting the backyard of his home. Id. at 88, 199–200. His home comprises five rooms. Id. at 29, 73, 88; Ex. 12. At the front door, there is a porch along part of the front of the house.

Id. The front door leads into an entryway, to the left of which is a living room. Id. The dining room is directly ahead. Id. Directly off the dining room to the left is Johnson's bedroom which he shares with his partner. Id. The kitchen is behind the dining room. Id. A hallway that runs parallel to the kitchen connects Johnson's bedroom to a second bedroom in the rear of the house. Id. The bathroom is off that hallway, which also has a door into the kitchen. Id. The home has no second floor; the basement contains no habitable space. Doc. No. 116 at 29.

On April 27, 2017, the sun rose at 5:44 a.m. Ex. 24. The temperature was in the low 50s with overcast skies.[2] About fifteen minutes later, at 6:00 a.m., fifteen law enforcement agents from the Department of Homeland Security, the U.S. Coast Guard, the Massachusetts State Police, the Taunton Police Department, and the Framingham Police Department arrived at 20 Burdette Street in several vehicles, including a van equipped to process electronic evidence. Doc. No. 88-3 at 1–2; Doc. No. 116 at 51. The van parked in front of Johnson's home, while some of the other law enforcement vehicles parked in Mr. Johnson's driveway—thereby blocking any car in the driveway from exiting—and others parked on the street. Id. at 51, 163.

Some, but not all, of the agents went up to the front porch, some standing directly in front of the door, while others remained on the lawn. Id. at 23. At least one agent went around to the back of the house, effectively surrounding it. Id. at 195. Other agents remained in their vehicles.

---

[2] Connolly testified at the hearing that it "wasn't sunny out," Doc. No. 116 at 22, and that she did not "believe that it was a sunny day," id. at 70, while Johnson testified that "it was not a warm morning," id. at 202. The Court takes judicial notice under Fed. R. Evid. 201(b)(2) that weather data from the nearest weather stations to Framingham—those in Norwood, Bedford, and Worcester—indicate that the weather at about 6:00 a.m. on April 27, 2017, was 52 or 53 degrees with overcast skies and mist or fog. Local Climatological Data, National Centers for Environmental Information, https://www.ncdc.noaa.gov/cdo-web/datatools/lcd (last visited February 1, 2019); see also Sharfarz v. Goguen (In re Goguen), 691 F.3d 62, 71 n.6 (1st Cir. 2012) (taking notice of publicly available weather records as evidence of weather conditions). There is no evidence before the Court that suggests the inaccuracy of these records.

All of the Homeland Security agents wore ballistics vests with police markings. <u>Id.</u> at 18. No officer drew a weapon. <u>Id.</u> at 25.

While the officers were gathering around the home, Johnson and his life partner Pat Kryzak were sleeping in their bedroom, the main bedroom of the home. <u>Id.</u> at 154, 190. The officers began banging on the door with a "loud pounding." <u>Id.</u> at 21, 191. The commotion awoke Kryzak and Johnson. <u>Id.</u> at 191. Johnson came out of his bedroom into the entryway area of the house where the agents could see him, at which point they shouted that it was the police and that he should "open up," which he did. <u>Id.</u> Johnson was shirtless, wearing only gym shorts and slippers. <u>Id.</u> at 191, 196. Before he opened the door, he observed the police cars in the driveway of his home that were blocking in his own car, which was parked at the end of the driveway, as well as other cars in the street. <u>Id.</u> at 199–200.

When Johnson opened the front door, the officers immediately entered the home and, after announcing that they had a search warrant, verbally directed Johnson to the kitchen, also taking his arm to escort him there. <u>Id.</u> at 195. When they reached the kitchen, Johnson saw through the back door of his home the agent stationed in the back to guard the rear door. <u>Id.</u> While the officers escorted Johnson to the kitchen, Kryzak came out of their bedroom into the dining room. <u>Id.</u> at 155. The agents told her they had a warrant and showed her the warrant, on which she observed Johnson's name and the address of the home. <u>Id.</u> Agents then gestured for Kryzak to go into the living room, the room farthest from the kitchen, where she was told to sit on the couch. <u>Id.</u> at 159. An agent brought in a chair from the dining room, placed it near the sofa, and sat by Kryzak. <u>Id.</u> at 160. At some point during the agents' time in the house, one agent posted labels with large letters in each room. <u>Id.</u> at 108.

In the kitchen, Johnson sat at the counter island with Richardson and Connolly. Id. at 198. Nearly immediately after entering Johnson's home, without exchanging pleasantries, and despite Johnson's obvious undress, the agents started an audio recorder and began to interrogate him at 6:08 a.m. Id. Both agents were wearing ballistics vests that identified them as police and gave the agents a big, bulky look, although the agents removed the vests when they sat down to commence their interrogation. Id. at 37–39, 74. By this point, at least ten agents or officers had entered Johnson's small home. There were two agents, at least, with him in the kitchen, others in the adjacent hallway and back bedroom, one with Kryzak in the living room, and still others in his bedroom and the dining room off of the kitchen. Id. at 161. Although all the agents in his home, with one exception, were wearing firearms on their waists, at no point did Connolly, Richardson, or any other agent present in the home draw or otherwise display a firearm. Id. at 25, 38, 45–46, 75, 133–34. No one offered to permit Johnson to retrieve clothing at this point. The agents did not inform Johnson about his Miranda rights before the interrogation began. Id. at 199. Johnson was not handcuffed or physically restrained in any other way. Id. at 45.

Shortly after the interview began, Connolly closed the door that leads from the kitchen into the back hallway where other agents were searching. Id. at 40. Connolly also asked about closing the door to the dining room, but there was no door. Id. at 89. The two agents then questioned Johnson for almost thirty minutes about his email accounts, his use of social media and Craigslist for sexual activities or pornography, his sexual preferences, and his interests in pornography. Ex. 1.

At 6:34 a.m., the agents turned off the recording device. Doc. No. 88 at 2. At some point after the agents stopped the recording, Kryzak asked for and received permission to leave the living room to get a bathrobe. Doc. No. 116 at 160. She then walked through the kitchen to the

hallway near the rear of the house, where the bathrobe was in a closet. Id. at 161. On her way, she observed Johnson at the kitchen island, noting that he was still shirtless and wearing only his gym shorts. Id. She saw agents throughout the home, including in both the second bedroom and the back hallway. Id.

As the agents' search of the home continued, Johnson remained in the kitchen, always with at least one or two agents and, for the first time, Johnson made a request to get more clothing. Id. at 196, 201–03. Richardson told Johnson that, because of the ongoing search, he could not move about the home, such as by going to his room to get clothes, and that if he needed clothes, an agent would get them for him. Id. at 197, 225. No agent was dispatched to obtain any clothing for Johnson in response to this request. Id. Johnson understood Richardson's response to mean that he was required to stay in the kitchen and therefore remained in the kitchen, clothed only in his gym shorts. Id. at 203.

At some point after the agents turned off the recording device, Richardson informed Johnson that agents were not able to find a certain folder on Johnson's computer that Johnson had told them contained child pornography on the recording. Id. at 42, 204. Johnson told Richardson that the folder was not on the computer, but rather was on a thumb drive on top of the door frame inside a closet in a bedroom at the rear of the house. Id. at 140–41. Richardson successfully retrieved the thumb drive from the location Johnson described. Id. at 140–41, 150. Richardson also asked Johnson whether he was willing to undergo a polygraph examination to confirm whether he had sexual contact with minors, and Johnson agreed. Id. at 46–48, 228.

During the approximately one hour the agents did not record their interactions with and questioning of Johnson, Johnson requested the agents permit him to make a phone call to inform his employers that he would not be coming to work. Id. at 206. The agents did not allow Johnson

to handle his iPhone, but rather looked up Johnson's employers' phone numbers in the iPhone themselves and then allowed him to place the calls on his landline phone. Id. at 207. At some other point during this unrecorded period between 6:34 a.m. and 7:35 a.m., Richardson encouraged Johnson to be honest with them because Richardson could inform the Court of his cooperation, which would be to Johnson's benefit. Id. at 209–10.

Meanwhile, after Kryzak returned to the living room in her bathrobe, agents asked her questions about where electronics, such as computers and cell phones, could be found in the house. Id. at 167. At some point later, Kryzak asked whether she would be able to go to work. Id. at 163. Agents told her that she would be able to go to work and allowed her to go to her bedroom to dress. Id. at 163–64. While she was in her bedroom and not fully dressed, a male agent opened the closed door between the bedroom and the dining room without knocking and entered the bedroom. Id. at 164. Kryzak told him that she was getting dressed, and he went back out into the dining room. Id. During all this time, Kryzak did not observe Johnson, who remained in the kitchen. Id. at 165–66.

At 7:35 a.m., agents Connolly and Richardson restarted the audio recorder. Ex. 1; Doc. No. 88 at 4. Connolly told Johnson that he was not under arrest at that point and asked him again about his consent to take a polygraph examination. Ex. 1. While the recording ran, Johnson also signed an acknowledgement of his Miranda rights. Doc. No. 116 at 56–57. The agents stopped the second recording at 7:38 a.m. Ex. 1.

After the second recording, Johnson was informed that he was under arrest. Doc. No. 116 at 53. At that point, Johnson asked again for more clothes. Id. at 211. This time, the agents granted the request. Id. An agent retrieved jeans and a T-shirt while Johnson remained in the kitchen, exchanging the T-shirt for a different shirt at Johnson's request. Id. at 212. Johnson also

requested shoes, but the agents told him to wear his slippers because otherwise the shoestrings would have to be removed. Id. He also asked to use the bathroom, and an agent then escorted him to the bathroom. Id. at 197–98. Although an agent did not enter the bathroom with him, one remained outside the bathroom door, which stayed cracked open. Id. at 63–64, 124–25, 127. Shortly thereafter, at about 8:00 or 8:30, Johnson was handcuffed and taken to the Framingham Police Department, a short drive from Johnson's home. Id. at 213. At the police station he was booked, processed and then waited for the polygraph examination. Doc. No. 88 at 4; Ex. 2. Kryzak ultimately left the house for work after agents had taken Johnson out of the house under arrest. Doc. No. 116 at 168–69.

The polygraph examination to which Johnson had consented was conducted by FBI Special Agent Christopher Braga, who was not present at the home during the search and Johnson's arrest. Doc. No. 100 at 4. The interview began at 10:27 a.m. Ex. 2. At the beginning of the interview, Braga informed Johnson of his Miranda rights, and Johnson again signed an acknowledgement of his rights. Id. Braga stated that the interview was not concerned with the child pornography matter that was the subject of the search of Johnson's home. Ex. 2; Doc. No. 100 at 5. The interview focused almost entirely on Johnson's sexual preferences and whether he ever had sexual contact with minors. Id. The interview ended at 1:26 p.m. Ex. 2.

II.    LEGAL STANDARD

"A search within the meaning of the Fourth Amendment 'occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable.'" United States v. D'Andrea, 648 F.3d 1, 5–6 (1st Cir. 2011) (quoting Kyllo v. United States, 533 U.S. 27, 33 (2001)). The defendant "has the burden of establishing that 'his own Fourth Amendment rights were violated by the challenged search or seizure.'" United States v. Rheault, 561 F.3d 55, 58–59

(1st Cir. 2009) (quoting <u>Rakas v. Illinois</u>, 439 U.S. 128, 131 n.1 (1978)). To do so, he must show that he "had a reasonable expectation of privacy in the place searched or the thing seized." <u>United States v. Thornley</u>, 707 F.2d 622, 624 (1st Cir. 1983). "The Supreme Court has set out a two-part test for analyzing the expectation question: first, whether the movant has exhibited an actual, subjective, expectation of privacy; and second, whether such subjective expectation is one that society is prepared to recognize as objectively reasonable." <u>Rheault</u>, 561 F.3d at 59. If the defendant establishes that the search violated his constitutional rights, then the "exclusionary rule, where applicable, requires suppression of evidence obtained in violation of the Fourth Amendment." <u>D'Andrea</u>, 648 F.3d at 6 (citing <u>Herring v. United States</u>, 555 U.S. 135, 129 (2009)).

"[A] warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." <u>Michigan v. Summers</u>, 452 U.S. 692, 705 (1981). But such detention, even if permissible, can also be custodial for the purposes of <u>Miranda</u>, because "a person questioned by law enforcement officers after being taken into custody or otherwise deprived of his freedom of action in any significant way must first be given <u>Miranda</u> warnings," which "are designed to protect against the extraordinary danger of compelled self-incrimination that is inherent in such situations." <u>United States v. Hughes</u>, 640 F.3d 428, 434–35 (1st Cir. 2011) (internal quotations omitted); <u>see also</u> <u>United States v. Widi</u>, 686 F. Supp. 2d 107, 112 (D. Me. 2010) ("the fact that a detention is permissible under the Fourth Amendment does not make the detention any less custodial for <u>Miranda</u> purposes").

III.    DISCUSSION

    A.    Physical Evidence

        1.    State Warrant for Woodhead's Email Account

Johnson first seeks to suppress the emails recovered from Woodhead's Yahoo email account, and fruits that resulted therefrom, on the basis that the warrant authorized by the Rhode Island state court magistrate, pursuant to which the emails were produced, was overbroad and therefore invalid. Doc. No. 93 at 6. But Johnson has not met his burden of demonstrating his reasonable expectation of privacy in the contents of Woodhead's email account. "[T]he Fourth Amendment does not protect items that a defendant knowingly exposes to the public," and, therefore, "if a letter is sent to another, the sender's expectation of privacy ordinarily terminates upon delivery." United States v. Dunning, 312 F.3d 528, 531 (1st Cir. 2002) (internal quotations and citations omitted). As a result, given that Johnson has sent his messages to another user, he no longer had a reasonable expectation of privacy in the messages after their delivery to that user. Because Johnson therefore lacks standing to challenge the warrant that sought Woodhead's emails, the Court need not decide the validity of the Rhode Island warrant.

Johnson argues that the Supreme Court's decision in Carpenter v. United States, 138 S. Ct. 2206 (2018), changed the analysis of a defendant's reasonable expectation of privacy with respect to electronic, rather than physical, messages in the possession of a third party. Doc. No. 93 at 12; Doc. No. 114 at 7–8. He argues that Carpenter recognized that "the government's technologically-enhanced search capabilities are qualitatively different, and more invasive, than searches carved out by the traditional exceptions to the warrant requirement." Doc. No. 114 at 12. As a result, he argues, the Supreme Court is likely to hold that a governmental search

infringes a person's Fourth Amendment privacy interests whether the search is of information held by one's own service provider or by someone else's. Id. at 10.

Carpenter held that a cell phone subscriber has a reasonable expectation of privacy in cell site location information stored by the cellular provider such that the government must obtain a search warrant before seeking such information from the provider. 138 S. Ct. at 2217. To hold otherwise, the Court reasoned, would be to subject cell phone users—a majority of Americans—to "tireless and absolute surveillance." Id. at 2218. But however Carpenter may have narrowed the third-party doctrine with respect to information stored on a service provider's server and associated with one's *own* account, that case did not address one's expectation of privacy in the electronic information, wherever stored, of *another* user. The other cases that Johnson cites to show "uncertainty about the application of the third-party doctrine to email," Doc. No. 93 at 12, similarly deal with one's expectation of privacy in the contents of one's *own* email account, despite the sharing of those contents with one's email provider. See, e.g., United States v. Ackerman, 831 F.3d 1292, 1304 (10th Cir. 2016); In re Grand Jury Subpoena, JK-15-029, 828 F.3d 1083, 1090 (9th Cir. 2016); United States v. Warshak, 631 F.3d 266, 288 (6th Cir. 2010); United States v. Forrester, 512 F.3d 500, 511 (9th Cir. 2008); United States v. Keith, 980 F. Supp. 2d 33, 39–40 (D. Mass. 2013). These cases therefore do not cast doubt on the application of the third-party doctrine to this case, and no more does Carpenter "settle[]" that question in favor of Johnson. Doc. No. 93 at 12.

Rather, the third-party doctrine continues to apply with force in this case. The information obtained pursuant to the search warrant served on Yahoo was stored in Woodhead's email account, not Johnson's. The information arrived in Woodhead's account because of Johnson's intent to "knowingly expose[] to the public," Dunning, 312 F.3d at 531, the contents

of his messages by sending them purposefully to another user. Johnson's intent to share the messages with Woodhead is significantly different than the average cell phone user's incidental and essentially unintended sharing of location data with her cellular provider. Sending email is more similar to the traditional sending of messages through the physical mail, the post-delivery search of which does not raise any prospect of "tireless and absolute surveillance." <u>Carpenter</u>, 138 S. Ct. at 2218. Accordingly, Johnson lacks a reasonable expectation of privacy in the messages and therefore the ability to challenge the validity of the search warrant served on Yahoo.

Johnson offers one final ground on which he contends he can challenge the search of Woodhead's Yahoo account. He contends that the search of Woodhead's email account should be viewed as a physical intrusion into a constitutionally protected area, and therefore as subject to the common-law trespassory test, an equally sufficient alternative to the reasonable-expectation-of-privacy test. Doc. No. 114 at 15; <u>see</u> <u>United States v. Jones</u>, 565 U.S. 400, 409 (2012). Although the common-law trespassory test would, in general, allow a Fourth Amendment challenge only from the person whose property was trespassed against, Johnson submits that the Supreme Court has also recognized that a defendant may challenge a search of someone else's property when he has an interest in that property. Doc. No. 114 at 16; <u>see also</u> <u>Stoner v. California</u>, 376 U.S. 483 (1964) (hotel room searched with hotel owner's permission, but not guest's); <u>Chapman v. United States</u>, 365 U.S. 610, 616–17 (1961) (apartment searched with landlord's permission, but not tenant's).

Even assuming, without deciding, that an email account could be a constitutionally protected area for the purpose of the common-law trespassory test, this argument fails. Unlike in the cases Johnson cites, in which the defendant exercised possessory control over the hotel room

or apartment at issue, Johnson had no control over Woodhead's email account at any point. As a result, Johnson had no property-like interest in Woodhead's email account itself; his only arguable interest was in the messages contained in the account. In this way, his messages again more closely resemble letters sent by one person to another person's home, which the sender has never entered. Once the letters have arrived in the recipient's home, the sender has no possessory interest in the letters, nor can the sender be said to have a property interest in the recipient's home. See Dunning, 312 F.3d at 531 (when letters were found in a governmental search of a home, defendant could "claim the protection of the Fourth Amendment only if he had a legitimate expectation of privacy in the [searched] home in general"). As such, even under the common-law trespassory test, Johnson may not challenge the search of Woodhead's email account.[3]

### 2. Federal Warrants

Johnson next seeks to suppress the emails recovered from his own Yahoo email account, and fruits that resulted therefrom, making two supporting arguments. Doc. No. 93 at 14–21.

First, Johnson argues that the March 13, 2017, warrant was based on the material received in response to the February 24, 2017, federal grand jury subpoena served on Craigslist. Id. at 14–15. Because that subpoena was overbroad and therefore obtained more information than permitted by the Stored Communications Act, Johnson argues, the warrant based on the information obtained from the subpoena was invalid, requiring suppression of the evidence obtained from its execution. Id. at 16–17.

---

[3] Johnson further argues that he demonstrated a subjective expectation of privacy by sending the messages to Woodhead anonymously. Doc. No. 93 at 10. But this subjective expectation would be relevant only if Johnson had also demonstrated that his expectation was also recognized as objectively reasonable. Rheault, 561 F.3d at 59. Without that showing, Johnson's manifestation of his subjective expectation is not relevant.

This argument fails for a simple reason: The March 13, 2017, warrant plainly did not rely on the information received in response to the February 24, 2017, subpoena. The affidavit that Agent Richardson submitted to the federal magistrate judge in support of the warrant offers 14 pages of information in support of probable cause, none of which was received in response to the Craigslist subpoena. <u>See</u> Doc. No. 93-2 at 11–25. Having provided that information, the affidavit then candidly offers information about the grand jury subpoena and Richardson's experience with the material received from that subpoena, specifying that he was "not relying on any of the information" from the Craigslist subpoena "to establish probable cause for the issuance of the warrant" requested. Doc. No. 93-2 at 25–26. The affidavit clearly offers sufficient probable cause for the issuance of a warrant for the requested information before it mentions the material provided in response to the subpoena. As a result, the Court need not decide whether the subpoena was unlawfully overbroad, and this challenge to the Craigslist warrant does not succeed.

Second, Johnson argues that both the March 13, 2017, warrant served on Craigslist and the March 31, 2017, warrant served on Yahoo were invalid because the Rhode Island federal magistrate judge who authorized the warrants lacked territorial jurisdiction over the crimes under investigation. Doc. No. 93 at 18. The Stored Communications Act ("SCA"), under which both warrants were authorized, authorizes the issuance of warrants for electronic communications by "any court that is a court of competent jurisdiction," 18 U.S.C. § 2703(d), which term is defined to include "any district (including a magistrate judge of such a court) . . . that . . . has jurisdiction over the offense being investigated," <u>id.</u> § 2711(3)(A). Johnson argues that the warrants are therefore invalid because the U.S. District Court for the District of Rhode Island lacks territorial

jurisdiction over the alleged crimes at issue in this case, which Johnson argues were perpetrated, if anywhere, in Massachusetts. Doc. No. 93 at 20.

Even assuming without deciding that § 2711 requires *territorial* jurisdiction, as well as subject matter jurisdiction, this argument also fails. Johnson offers no evidence upon which the Court could conclude that the Rhode Island law enforcement personnel at work in this case were not investigating crimes committed within the jurisdiction of the District of Rhode Island. The warrant, on its face, states that the information was sought for use in the investigation of violations of the federal child pornography laws by "Richard F. Woodhead and others." Doc. No. 93-3 at 6. At the time of the warrant application, Richardson knew that Woodhead's Craigslist posting, to which Johnson responded, appeared to have been posted from Cumberland, Rhode Island. Id. at 10. He also knew that Woodhead had identified himself in communications with Johnson as in the "Providence area." Id. at 20. Richardson, who wrote the warrant application, was also based in Rhode Island, and was assigned to the Internet Crimes against Children Task Force in Rhode Island. Id. at 8–9. These facts set forth in the warrant application provide ample reason to conclude that Richardson was investigating crimes potentially committed in Rhode Island.

That the charges in the present case were ultimately brought in Massachusetts or that Johnson is a resident of Massachusetts is immaterial. The SCA does not limit the use of evidence produced pursuant to a § 2703 warrant to crimes ultimately charged in the judicial district of the federal district court that issued the warrant. Rather, again assuming without deciding that § 2711 requires territorial jurisdiction, the SCA limits the issuance of § 2703 warrants to investigations of offenses committed in the issuing court's judicial district. As an "offense involving . . . transportation in interstate or foreign commerce," a violation of the federal child pornography

laws may be "prosecuted in any district from, through, or into which such commerce . . . moves."

18 U.S.C. § 3237(a). Although the warrants at issue did identify the defendant as a resident of

Massachusetts, the investigation could have determined that its target crimes—which are not

limited to or even necessarily encompassed by the present charges—could or should have been

charged in another jurisdiction, such as Rhode Island. Accordingly, this challenge to the validity

of the two warrants also fails.[4]

B.      Statements

1.      At Johnson's Home

Johnson next seeks to suppress the statements he made during the search of his home.

Doc. No. 88 at 4. He argues that he was in custody during the interrogation conducted during the

search, but had not been advised of his Miranda rights, thus rendering his statements

inadmissible. Doc. No. 88 at 4. Because the government concedes that Johnson was interrogated

at his home without Miranda warnings, Doc. No. 116 at 249, the only question before the Court

is whether Johnson was in custody during the interrogation.

Whether a suspect is in custody during an interrogation is clear when that suspect is

under formal arrest. Hughes, 640 F.3d at 435. In cases short of formal arrest, "an inquiring court

uses a two-part test to see if a person is in custody for Miranda purposes: first the court examines

the circumstances surrounding the questioning and then it sees whether those circumstances

would cause a reasonable person to have understood his situation to be comparable to a formal

arrest." United States v. Guerrier, 669 F.3d 1, 6 (1st Cir. 2011). "Determining what constitutes

custody can be a slippery task," United States v. Ventura, 85 F.3d 708, 711 (1st Cir. 1996)

---

[4] Johnson does not separately challenge the validity of the April 26, 2017, warrant, Doc. No.
93-4, that authorized the April 27, 2017, search of his 20 Burdette Avenue home.

(citation and internal quotation omitted), that requires "considering the totality of the circumstances," United States v. Mittel-Carey, 493 F.3d 36, 39 (1st Cir. 2007) (citation and internal quotation omitted).

To guide the custody inquiry, the First Circuit "has identified four factors that, among others, may inform a determination of whether, short of actual arrest, an individual is in custody. These factors include whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." Hughes, 640 F.3d at 435 (internal quotations omitted). "[T]he determination of whether custody exists depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Id.

Here, the interview of Johnson took place in his own home, which "generally presents a less intimidating atmosphere than, say, a police station." Hughes, 640 F.3d at 436. However, the defense argues that the facts of this case resemble those in Mittel-Carey, a case in which the First Circuit ruled that questioning conducted in the defendant's home had been a custodial interrogation. 493 F.3d at 39–40. In that case, the First Circuit found "dispositive" several facts: "(1) the early hour of the search and interrogation (6:25 AM); (2) the presence of eight officers in the home; (3) that the defendant was confronted with an unholstered gun in his darkened bedroom; (4) the physical control the agents maintained over the defendant at all times; (5) the length of the interrogation (ninety minutes to two hours); and (6) the coercive statements made by the interrogating agent, which seemed designed to elicit cooperation while carefully avoiding giving the defendant Miranda warnings." Id. at 40.

Among the six facts in <u>Mittel-Carey</u> that the First Circuit found dispositive, "the element that carrie[d] the most weight [wa]s the level of physical control that the agents exercised over the defendant during the search and interrogation." <u>Id.</u> The defendant had been "ordered to dress, go downstairs, and was told where to sit; he was physically separated from his girlfriend and not allowed to speak to her alone; and he was escorted by agents on the three occasions that he was permitted to move, including while he used the bathroom." <u>Id.</u> Accordingly, "[w]hile an interrogation in a defendant's residence, without more, certainly weighs against a finding of custody, the level of physical control the agents exercised over [the defendant] in this case weighs heavily in the opposite direction, despite the fact that the control was exercised inside defendant's home." <u>Id.</u>

In this case, applying the factors identified by the First Circuit and considering the totality of the circumstances, the Court concludes that a reasonable person in Johnson's circumstances would have understood himself to be in custody. While the interrogation occurred within Johnson's home, a fact weighing against a finding of custody, the agents exercised immediate and total control over both Johnson's home and Johnson himself. They arrived earlier in the morning than the officers in <u>Mittel-Carey</u>.[5] At least ten armed officers in ballistics vests entered as soon as Johnson opened the door. Once inside the home, the officers separated Johnson and his partner, moving them to opposite ends of the home while simultaneously occupying every room of the house, and physically took Johnson into the kitchen.

---

[5] The circumstances of this case lack some of the coercive details of <u>Mittel-Carey</u>—for example, in this case, the agents did not enter Johnson's bedroom while he slept, they did not unholster any weapons, and the agents' statements about cooperation were meaningfully different. Nonetheless, the agents clearly exhibited a similar or greater "level of physical control . . . over the defendant during the search and interrogation." <u>Mittel-Carey</u>, 493 F.3d at 40. Accordingly, after weighing these details, the Court concludes that their absence is not dispositive.

Thereafter, over the next two hours, the agents executing the search "exploited [the] cozy confines" of Johnson's "small" home and "invaded the defendant's personal space." Hughes, 640 F.3d at 436 (describing factors that would weigh toward custody during an interrogation at defendant's home). Johnsons was not permitted to speak with Kryzak, either with or without the agents. Johnson remained dressed only in gym shorts, apparently the clothing in which he had slept. The only means out of the kitchen led to other officers—within Johnson's home, in front of the home, and even behind it—and the officers shut the one open door out of the kitchen, closing off that space. Kryzak, meanwhile, was under the watchful eye of at least one officer in the living room. When she wanted a robe or, later, to dress, she required permission from the officers. When Johnson needed the bathroom, they escorted him there.

The totality of the officers' actions in this case imposed more physical control—the factor that the First Circuit found strongest in the Mittel-Carey custody analysis—than the control exercised by the officers in Mittel-Carey itself, making the custodial nature of Johnson's interrogation particularly apparent. Shortly after sunrise, a contingent of armed officers parked in Johnson's driveway, blocking in his car; entered his home; separated him from his partner, the only other person in the house; maintained control of his cell phone; did not permit him to move about the home or outside his home; confirmed that he was not going to work; recorded his interrogation—or not, as they saw fit; and, for a substantial period of time, including nearly all of the interrogation, kept him mostly undressed, wearing only the gym shorts in which he slept. Because of this level of physical control, Johnson recognized what the objective facts made clear—he could not and would not leave without the officers' permission.

Indeed, the agents' interactions with Johnson implicitly confirmed his detention. At no time did the officers tell Johnson he was free to leave or move about the house, nor did they

permit him to do so. Recognizing the limits on his movement, Johnson asked to call his employers, explaining to the officers he did not think he was going to work that day. Even though Johnson was not then under any formal arrest, the agents did not respond by correcting Johnson's misimpression and telling him that he was free to leave for work if he wished. Rather, by retrieving Johnson's employers' phone numbers from his iPhone and providing them to Johnson, the officers confirmed to Johnson that, despite the absence of formal arrest procedures, he was not free to leave and would not be going to work that day.

Theoretically, despite having been told by law enforcement officers that he was not free to move about within his home and, effectively, that he could not leave for work, Johnson could have stood up during his interrogation, shirtless in gym shorts with slippers under his feet, without his phone, wallet, or car keys (useless to him in any event), and walked out the back door into the raw mid-50s April day, where he would likely encounter the officer guarding the rear of his home. But no reasonable person would do that, because a reasonable person in Johnson's position would have believed that he was in custody, "comparable to a formal arrest," Guerrier, 669 F.3d at 6, and therefore not free to leave.[6] Other factors also weigh in favor of

---

[6] The First Circuit has recognized the tension during the execution of a search warrant between officers' physical control of a home, which is both "necessary for evidence preservation and officer safety" and permitted by the Fourth Amendment, and the right against self-incrimination, both protected by the Fifth Amendment and implicated by a custodial interrogation. See Mittel-Carey, 493 F.3d at 40 (describing the need for the government to balance these interests). Even so, neither the Court's ruling nor the law it applies dictate that the execution of every search warrant creates a custodial setting. Indeed, many cases in this Circuit have found, on different facts than those of this case, that an interrogation during the execution of a search warrant was not custodial. Cf. Hughes, 640 F.3d at 436–37 (finding no custody where, during questioning in a "relaxed and non-confrontational" atmosphere, the defendant was allowed to go outside to smoke a cigarette and to determine on his own when questioning would resume); United States v. Nishnianidze, 342 F.3d 6, 14 (1st Cir. 2003) (finding no custody where officers did not "restrain [defendant's] movement"); United States v. Crooker, 688 F.3d 1, 11 (1st Cir. 2012) (finding no custody where defendant "moved freely about his property throughout the search" and "officers asked [defendant] if they could talk to him"); United States v. Kearney, Crim. No.

finding that Johnson was in custody: the nearly two-hour duration of the interrogation,[7] the

agents' statements made to elicit cooperation, and the police vehicles blocking his car into his

driveway. Accordingly, evidence of the statements Johnson made at his home without having

been informed of his <u>Miranda</u> rights must be suppressed.[8]

2.    <u>At the Framingham Police Department</u>

Johnson finally seeks to suppress the statements he made to the polygraph examiner at

the Framingham Police Department. Doc. No. 88 at 8. He argues that the agents used a deliberate

two-step process by first eliciting statements from him at his home, before informing him of his

<u>Miranda</u> rights, and then questioning him again on the same topics at the police station. <u>Id.</u>

Allowing as evidence his statements made at the police station, he argues, would therefore

violate the prohibition in <u>Missouri v. Seibert</u>, 542 U.S. 600 (2004), on such deliberate two-step

strategies. <u>Id.</u>

"[I]n the absence of coercion or improper tactics by law enforcement in obtaining an

initial statement, a subsequent statement is admissible if the defendant was advised of his

<u>Miranda</u> rights and knowingly and voluntarily waived those rights. However, suppression may

---

08-40022-FDS, 2009 WL 4591949, at *4 (D. Mass. Nov. 30, 2009) (finding no custody where officers told defendant "that he was free to leave at any time").

[7] The interrogation of Johnson plainly continued during at least some portion of the one hour that the agents elected not to record. During this period, the agents confronted Johnson with the fact that they had not found the folder in which he had said he stored child pornography and asked him where to find the folder. They also explained the purposes of a polygraph, requested and obtained his consent to a polygraph examination, and suggested that honesty and cooperation could benefit him.

[8] Because "failure to give adequate <u>Miranda</u> warnings does not require suppression of the physical fruits of those unwarned statements," <u>United States v. Hinkley</u>, 803 F.3d 85, 91 (1st Cir. 2015), the suppression of evidence of the statements Johnson made at his home does not require suppression of any of the physical evidence found at his home, even if agents would not have found the evidence but for Johnson's statements—a question that the Court need not and does not decide.

be proper when police deliberately employ a two-step interrogation tactic designed to circumvent Miranda warnings." United States v. Faust, 853 F.3d 39, 47–48 (1st Cir. 2017) (citations omitted). The four-justice plurality in Seibert laid out a test based on the circumstances of the two interrogations that considers "(1) the completeness and detail of the questions and answers in the first round of interrogation; (2) the overlapping content of the two statements; (3) the timing and setting of the first and the second interrogations; (4) the continuity of police personnel; and (5) the degree to which the interrogator's questions treated the second round as continuous with the first." Id. at 48. Justice Kennedy, who provided the fifth vote for Seibert, described "a narrower test" in which only "the deliberate use of a two-step interrogation creates a presumptive taint." Id.

Although the First Circuit has "not settled on a definitive reading of Seibert," id., Johnson's argument fails under both the plurality's approach and Justice Kennedy's narrower approach. First, none of the evidence before the Court suggests that the agents used a deliberate two-step strategy to elicit incriminating testimony from Johnson, satisfying Justice Kennedy's test. See United States v. Jackson, 608 F.3d 100, 104 (1st Cir. 2010) ("Under Justice Kennedy's test, the lack of any pre-planned evasion of Miranda defeats" a Seibert claim).

Next, the factors in the plurality's test similarly weigh against suppression. The second interrogation occurred about three hours after the first interrogation ended and was conducted at a different location by an agent who was not present for the first interrogation. At no point during the second interrogation were Johnson's statements during the first interrogation mentioned, and there was no suggestion that the second interrogation was a continuation of the first or otherwise intended to build on the first. The second interrogation focused on whether Johnson ever had sexual contact with minors, while the first one focused on the child pornography that was the

subject of the search. <u>See</u> <u>Faust</u>, 853 F.3d 39, 48–49 (no <u>Seibert</u> issue where the second interrogation was in a different setting, had different questions, and did not utilize responses from or otherwise continue the first); <u>United States v. Verdugo</u>, 617 F.3d 565, 575 (1st Cir. 2010) (no <u>Seibert</u> issue where the second interrogation was over an hour after the first and in a different location).

As a result, because Johnson's second interrogation was made after he was informed of his <u>Miranda</u> rights, and because the circumstances of the two interrogations do not require suppression under <u>Seibert</u>, his challenge to the use of the statements he made at the Framingham Police Department fails.

IV.    <u>CONCLUSION</u>

In accordance with the foregoing, Johnson's motion to suppress physical evidence, Doc. No. 92, is DENIED. Johnson's motion to suppress statements, Doc. No. 87, is ALLOWED IN PART by suppressing the evidence of Johnson's statements obtained during the search of his home, and OTHERWISE DENIED. The Court will hold a final pretrial conference on June 7, 2019, at 2:00 p.m. in Courtroom 13. Trial will commence on June 10, 2019, at 9:00 a.m.


SO ORDERED.


 /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge